49 CCPA
**Application of Cletis L. ROBERSON.
Patent Appeal No. 6717.**

United States Court of Customs and Patent Appeals.
Dec. 20, 1961.

Charles F. Schroeder, Milwaukee, Wis., for appellant.

Clarence W. Moore, Washington, D. C. (D Kreider and George C. Roeming, Washington, D. C., of counsel), for Commissioner of Patents.

Before WORLEY, C. J., and RICH, MARTIN, and SMITH, JJ., and Judge WILLIAM H. KIRKPATRICK.*

MARTIN, Judge.

This is an appeal from that part of a decision of the Board of Appeals of the United States Patent Office which affirmed the examiner's rejection of claims 7–9, 14, 15 and 18 of appellant's application for a patent on "Production of Uniform Continuous Fibers of Thermoplastic Material." The board reversed the examiner as to his rejection of two claims and they stand allowed.

Claims 8 and 14 are illustrative and state:

"8. The method of producing continuous mineral fibers having end-to-end uniformity in diameter comprising providing a molten body of thermoplastic mineral material, flowing a stream of said material through a temperature-controlled zone, allowing said stream to cool on emission from said zone, attenuating said cooling stream directly from said zone into a continuous fiber, winding said fiber into a round package rotated at a uniform angular speed in a winder, said attenuation being effected by forces supplied by the winder acting on said fiber, and gradually decreasing the viscosity of successive adjacent portions of said stream as they pass through said zone by gradually increasing the temperature of said zone to increase the rate of flow of material therethrough in matched relation to the general rate of build up in diameter of the package.

"14. Fiber producing apparatus comprising in combination a container for a molten body of thermoplastic material, an electrically heated feeder associated with said container for forming a plurality of streams of said material, a rotary winder for attenuation of said streams into continuous fibers and for winding said fibers into a package, a gathering device between said feeder and winder for grouping said fibers into a strand before being wound into said package, temperature-measuring means for measuring the temperature of said feeder and for supply of control signals proportional to said temperature measurements, presettable control means arranged to receive said control signals to regulate the temperature of said feeder at a preset value, and means for supplying auxiliary signals to said control means to vary the temperature of said feeder in substantially matched relation to cyclic variations in the rate of attenuation of said fibers."

The references relied on by the examiner and the board are:

Brenzinger 1,980,610 Nov. 13, 1934; Slayter 2,150,945 Mar. 21, 1939; Kline 2,214,332 Sept. 10, 1940; Simison et al. 2,407,295 Sept. 10, 1946; Dickey et al. 2,491,606 Dec. 20, 1949.

This application relates to the production of continuous mineral fibers by mechanical attenuation of streams flowing from a molten body of a thermoplastic mineral material such as glass. It appears to be common to form a plurality of continuous fibers, gather them into a single strand as they are formed, and

* United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate in place of Judge O'CONNELL, pursuant to provisions of Section 294(d), Title 28 United States Code.

wind the strand in uniform layers on a rotating collection spool. The force for fiber attenuation is provided by the winder. It is stated to be customary to collect a strand on the rotating spool at linear speeds of 15,000 to 20,000 feet per minute for 15 to 30 minutes. The strand is then broken and the resulting strand package replaced with an empty collection spool.

When, as was apparently customary in the prior art, the collection spool is rotated at a uniform angular speed and the molten material held in the feeder at a uniform temperature, a gradual decrease in fiber diameter is observed during a collection cycle because, suggests appellant, the linear speed of attenuation is dependent on the diameter of the collection spool and this varies from its diameter when empty to the diameter of the completed package of spool plus collected fibers. Thus the linear speed of attenuation gradually increases during the collection cycle. Since the amount of molten material flowing as a stream through a spinning orifice is constant at a given temperature, the gradual increase in linear attenuation speed produces a gradual decrease in fiber diameter.

Appellant's problem was the production of mineral fibers of uniform diameter. Appellant appears to have solved this problem by gradually increasing the temperature of the thermoplastic material flowing from the feeder to match the increase in linear attenuation speed with package build-up. When a strand package of desired size has been collected, the material temperature is allowed to drop to its value at the start of the collection cycle and then collection of a fresh strand package is started.[1] According to appellant, the mineral material, particularly glass, becomes less viscous as its temperature is increased. Therefore, the material flows more and more freely from the feeder, thus meeting the gradually increasing demand for fiber material as the fiber attenuation speed increases. The result is a uniform fiber diameter.

It is this process of producing "continuous mineral fibers having end-to-end uniformity in diameter" which is recited in appealed claims 7–9.

Appellant also claims as his invention, apparatus for producing fibers by the process of claims 7–9. The apparatus disclosed appears to include the usual container for molten material, an electrically-heated feeder to form a plurality of fiber-forming streams, a rotary winder to attenuate the partially formed fibers and collect the fibers after they have been gathered into a strand, and thermocouple means to sense the feeder temperature and send electrical signals to a control unit whereby the feeder can be maintained at a fixed predetermined temperature. In addition, appellant's apparatus includes means for sending additional electrical signals into the temperature control circuit in accord with a predetermined time-intensity pattern so that the control unit will cause the feeder temperature to rise and fall during a strand collection cycle in accord with appellant's method. As to this time-patterned auxiliary signal, appellant states that it "is arranged to oppose the thermocouple signal as it increases, to falsely indicate to the unit 29[2] that the temperature of the feeder is gradually diminishing. That is, the regulator unit receives a false temperature signal which causes it to allow the current flow through the feeder to gradually increase and consequently effect a gradual increase in temperature of the feeder."

During a collection cycle, appellant programs the auxiliary signal so that it is gradually increased during a collection, raising the temperature of the feeder, for example, from 2300°F to 2315°F during 20 minutes, and then is cut off completely, allowing the feeder temperature to return to 2300°F during the few seconds neces-

---

1. The application states that appellant's invention permits commercial production of glass fiber strands with a 1% tolerance in dimensional uniformity of fibers, whereas fibers produced by prior art processes have at least a 7% diameter variation within a strand package.

2. Unit 29 is the control unit which ordinarily would receive signals only from the feeder thermocouple.

sary to replace the completed strand package with an empty collection spool.

Appellant discloses two specific auxiliary signal generators but it is not necessary to describe them since their details are not recited in the appealed claims.

The rejection of the appealed claims is based entirely on the obviousness of the claimed process and apparatus in view of a combination of prior art patents.

The principal reference relied on is Simison et al. which discloses a process and apparatus for forming glass fibers. Streams of molten glass flowing from an electrically-heated feeder are drawn into fibers which are gathered into a strand and wound on a rotating collection spool. Attenuation force is provided by the winder. The importance of accurate temperature control in the feeder and in the region of attenuation is emphasized. The only features of appellant's claimed apparatus not disclosed by Simison et al. are the temperature sensing and temperature control means necessary to practice appellant's process.

The secondary references relied on are Slayter, Brenzinger, Kline, and Dickey et al.

Slayter discloses production of discontinuous wool type glass fibers by drawing flowing streams of molten glass into fine filaments by frictional contact of the glass with a rotating drum. The filaments do not wrap around the drum but rather, leave the drum surface and accumulate in the form of wool. Slayter is relied on by the examiner and the board for the teaching that filament diameters may be decreased either by increasing the drum speed or by increasing the viscosity of the molten glass by decreasing its temperature.

Brenzinger discloses production of continuous threads of rayon from a "synthetic fluid material" by a spinning process. The following statements from Brenzinger are relevant here:

"The present invention relates to rayon spinning machines, by which is meant machines that form threads or the like from a synthetic fluid material. Machines of this type are characterized by a pump that delivers fluid material [through a small spinning orifice] to a setting bath and a spool which winds the thread thus formed as it emerges from the bath. As wound material accumulates on the spool its diameter increases and, consequently, said spool winds more and more thread per revolution as its diameter increases. It has heretofore been the practice to have the spool rotate at a uniform speed and to have the pump deliver fluid material at a constant rate. I have found that, in these circumstances, the thickness of the thread gradually diminishes as the diameter of the wound material on the spool increases. The main object and feature of this invention is to so coordinate the speed at which the thread is being wound and the rate at which the fluid material is being supplied that the thread will have substantially the same thickness throughout."

Brenzinger obtains a uniform thread thickness by gradually increasing by mechanical means the speed of the fluid material pump to match build-up of wound material on the collecting spool.

Kline is also concerned with the production of continuous synthetic fibers such as artificial silk. The following sentences of Kline are pertinent:

"More specifically the invention is applied to an artificial silk spinning machine in which the spinning solution is fed by a motor-driven pump through a coagulating solution, formed into a thread and wound upon a bobbin. The bobbin is rotated at a constant axial speed and as the package is wound up the linear speed of the material being wound constantly increases due to the increase in diameter of the package. The feeding means must be operated at a variable speed to compensate for this change in linear speed. * *"

Kline obtains a uniform thread thickness by sensing package build-up with a

light-sensitive cell and causing the response of the cell to control the spinning solution pump through an electrical circuit.

The Dickey et al. patent discloses "measuring and/or control systems, particularly of the electronic circuit type." In one particular embodiment which the board appeared to consider relevant, the temperature of an electric furnace is continuously measured and controlled. The furnace is heated by a resistance element. The furnace temperature is sensed by a second resistance element which is one arm of a "phase sensitive a.-c. bridge" in a known circuit for continuously measuring the temperature of a furnace and providing a visual indication thereof with a pen arm on a moving chart. A change of furnace temperature changes the resistance of the sensing element, thereby unbalancing the bridge. This actuates a motor which both moves the pen arm and rebalances the bridge. Dickey et al. have added to this known measuring circuit a "deviation network" containing a balanceable resistance "loop circuit." The motor just mentioned, when actuated by a furnace temperature change, in addition to its previously mentioned functions, also unbalances the loop circuit by moving a contact arm along a slide wire potentiometer which is part of the loop circuit. This unbalancing in turn activates a control unit which regulates the amount of electrical energy passing through the furnace heating element. Thereby the furnace is returned to its original temperature, the motor again actuated, and the loop circuit rebalanced. Dickey et al. have also provided for separate and deliberate unbalancing of the deviation network loop circuit in a predetermined time pattern. Thus, according to the desire of the operator, the furnace may be maintained automatically at a predetermined fixed temperature or the furnace temperature may be varied by imposing on the loop circuit a program of continuous or discontinuous unbalancing which is automatically corrected by corresponding changes in furnace temperature.

Dickey et al. also provide compensation means to take care of thermal lags in the heating system from the time a change is made in the amount of electrical energy being passed through the furnace heating element to the time the furnace sensing element detects this change.

The appealed claims stand rejected as being unpatentable over Simison et al. in view of the patents to Brenzinger, Kline, and Slayter, the Dickey et al. patent being cited to show "the state of the control art." It appears that Kline and Brenzinger have been cited to show that the problem of "increasing attenuation in a spool spinning operation" is well known. It further appears that Dickey et al. is relied on to show a control system "in which a program signal is imposed upon a present control," and that Slayter is cited to show prior recognition of the factors involved in the control of spun glass for the production of uniform diameter filaments. The board stated:

"* * * It is thus the examiner's position in essence, that the application of such a control system to Simison's heater would be obvious if it were desired, as suggested in Slayter, to control the attenuation of the fiber through the temperature and viscosity of the melt."

The board agreed with this position, stating in effect that the application of the ample Slayter teachings to the Simison et al. process for the control of the diameter of spun fibers would be obvious and that the addition of "automatic controls" of the type shown in Dickey et al. would not be of patentable significance.

It is interesting to note that appellant in his brief stated, when referring to the principle of modifying the diameter of glass fibers (when said fibers are being rolled on a spool) by controlling the temperature of the glass mass which in turn affects its viscosity, that "* * * appellant in the present instance is not claiming the principle but a combination of steps and a combination of elements in which the principle is applied for compensation of increased speed of fiber attenua-

tion with package build up." Keeping this in mind, we first turn to claims 7, 8 and 9, the method claims. It seems to us that with knowledge of the attenuation compensation principles taught by Brenzinger and Kline, it is not unreasonable to conclude that the method recited in these claims would be obvious to a person of ordinary skill in this art from the teachings of Simison et al. and Slayter.

Appellant objects to the examiner and the board combining these references as a basis for the rejection of these claims. Let us analyze this complaint. First of all, appellant's objective should be noted again. He was endeavoring to wind glass fibers on a spool and at the same time keep the diameter of the fibers constant.

We believe that anyone skilled in the winding art generally would know that the rate of accumulation of fibers being wound on a spool will increase as the successive layers of fibers increase the diameter of the spool when the speed of the rotation of the spool is constant. Also, anyone familiar with the art of spinning synthetic fibers would know that the attenuation of the synthetic fibers will increase under these circumstances. At least appellant does not contend that he discovered this problem but he does say that he solved it insofar as keeping the diameter of the fibers constant is concerned. How did he solve it? This is the crux of this portion of this case dealing with the method claims. He solved it in accordance with the teachings of Slayter. Slayter's specification states:

"The diameters of the fibers of wool produced by the method herein set forth may be adjustably varied and controlled by varying the speed at which the spinning drum 20 is rotated, by varying the size of the outlets 17, and by varying the temperature and viscosity of the glass. An increase in the speed of the drum serves to draw the filaments out to a smaller diameter. Any reduction in the size of the outlets 17 and the streams of glass flowing therethrough correspondingly reduces the size of the filaments. Reduction in

the temperature of the issuing glass increases its viscosity and slows down the rate of flow with a consequent reduction in the size of the filaments."

Certainly, anyone being taught the principles set forth in the last portion of the above quoted paragraph could assume the converse to be true. Furthermore, we disagree with appellant's contention that Slayter does not teach that the principle of varying fiber diameter by temperature and viscosity changes can be used to solve the attenuation problem encountered in synthetic fiber spooling. The first part of the above quoted paragraph of the Slayter patent supports this position.

Appellant places some emphasis upon the recitation in his method claims of a required relationship between the rate of increase of the temperature of the heating zone and the rate of diameter increase of the spool as evidence of patentability. No formula is set forth as to specific temperature in relation to the build up of the package. Furthermore, it is common knowledge that the diameter of a spool increases gradually as fibers are being wound upon it. Therefore, it would be a natural deduction that, if the viscosity of the glass mass is to be regulated for the purpose of keeping the diameter of the fibers constant, it would necessarily have to be done in some relationship to the gradual package build up.

As to appellant's contention that an unreasonable accumulation of references was used as the basis of the rejection of these method claims, it can be seen from the previous discussion that this position is untenable.

We find no other features in these method claims which would impart patentability to them over Simison et al. in view of Slayter. We therefore *affirm* the decision of the board as to claims 7, 8 and 9.

Coming now to the apparatus claims, there is no question but that appellant's combination as described in the specification is patentably distinguishable from the combination of references inso-

far as the structural features are concerned. For instance, it is questionable whether the programming device of Dickey et al. could be adapted to the thermocouple temperature control structure of appellant. However, the problem here is whether these structural features are adequately defined in the claims so as to distinguish them from the Dickey et al. control system.

Appellant argues that his combination is patentably different and we agree that the combination described in the specification is. But nowhere does he point out that the claims recite the distinguishing features and we do not believe they do.

In claim 14 the significant words are—

"* * * temperature-measuring means for measuring the temperature of said feeder and for supply of control signals proportional to said temperature measurements, presettable control means arranged to receive said control signals to regulate the temperature of said feeder at a preset value, and means for supplying auxiliary signals to said control means to vary the temperature of said feeder in substantially matched relation to cyclic variations in the rate of attenuation of said fibers."

"Temperature-measuring means for measuring the temperature of said feeder and for supply of control signals proportional to said temperature measurements, presettable control means arranged to receive said control signals to regulate the temperature of said feeder at a preset value" is broad enough to read on the Dickey et al. structure which we have discussed supra. The following words of that patent are also relevant:

"In our present invention additionally we provide a deviation network 25 for continuously comparing the actual value of the temperature or other variable with a desired or standard value. The network 25 continuously determines the deviation, if any, between the actual and the de-

sired value of the variable or variables and utilizes such information in continuously visually advising the extent of deviation or as a basis for the control of the same or another variable which may or may not contribute to the change or maintenance of the original variable being measured."

In considering the other feature of the combination, the programmer, the wording of claim 14 "and means for supplying auxiliary signals to said control means to vary the temperature of said feeder in substantially matched relation to cyclic variations in the rate of attenuation of said fibers" does not patentably distinguish from Dickey et al.'s disclosure which reads:

"In the embodiment of Fig. 1, we desirably continuously compare the actual temperature at the element 5 with a desired or standard temperature to be maintained within the furnace 6 and illustrate the deviation network 25 as containing a time cycle or program mechanism 28 establishing the desired or standard temperature which may be uniform over the 24-hour period or may be programmed to have a different temperature at different times of the day."

Further, Dickey et al. disclose "means for supplying an auxiliary reference signal to said control circuit to falsely indicate to said control circuit the occurrence of a variance in feeder [3] temperature, and means for programming said auxiliary signal * * *" as recited in claim 15. Although appellant urges that Dickey et al. is deficient as a reference because it does not suggest "providing a false signal *opposing* the actual temperature signal provided by the temperature sensing mechanism" [emphasis ours], it is noted that this feature is not recited in any of the claims.

We find no features in claims 14, 15 or 18 which cause them to be patentably distinguishable from Simison in view of

3. The furnace of Dickey et al. is equivalent to appellant's "feeder."

Slayter and Dickey et al. In view of the foregoing, we are of the opinion that the board's decision regarding claims 14, 15 and 18 as well as its decision as to claims 7, 8 and 9 should be affirmed.

Affirmed.